Filed 11/17/14  Daou v. Hamady CA6

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| AUDI DAOU, as Executor, etc.,<br><br>    Plaintiff, Cross-Defendant and Appellant,<br><br>v.<br><br>CARMEN HAMADY, as Cotrustee, etc., et al.,<br><br>    Defendants, Cross-Complainants and Respondents;<br><br>MAJID DAOU et al.,<br><br>    Cross-Defendants and Appellants;<br><br>JOHN I. KESSLER, as Special Cotrustee, etc.,<br><br>    Defendant, Cross-Defendant and Respondent. | H038994<br>(Santa Clara County<br>Super. Ct. No. 111PR168895) |
| CARMEN HAMADY, as Cotrustee, etc.,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>AUDI DAOU et al.,<br><br>    Defendants and Appellants. | H039461<br>(Santa Clara County<br>Super. Ct. No. 111PR168895) |

# I. INTRODUCTION

Imad "Ed" Daou and respondent Carmen Hamady,[1] a married couple who had two children, executed a revocable trust in 2006. The trust estate included community property, as well as property that the couple had specified by a written property ownership agreement was Ed's separate property. The trust instrument provided for the revocation of the trust as follows: "During the joint lifetime of Settlors, this Trust may be revoked, in whole or in part, with respect to the community property of Settlors by an instrument in writing signed by either Settlor and delivered by certified mail to all current acting Trustees and the other Settlor, and with respect to separate property by an instrument in writing signed by the Settlor who contributed that property to the Trust, delivered by certified mail to the Trustees."

On July 6, 2011, Carmen filed for dissolution of marriage. Two weeks later, on July 20, 2011, Ed executed a written revocation of the trust. Carmen's family law attorney received notice of the revocation the following day. On or about July 26, 2011, Ed allegedly executed a will in which his siblings, appellants Audi Daou, Majid Daou, and May Daou, were named as beneficiaries. On July 27, 2011, Ed killed himself and the couple's son. After Ed's death, Carmen received the written revocation of the trust.

In case No. H038994, Audi, Majid, and May appeal from two orders of the probate court. In the first order, the court determined that Ed's revocation of the trust was invalid. In the second order, the court determined that the property ownership agreement between Ed and Carmen concerning the separate property of Ed was void, and that the property referred to in the agreement was therefore community property.

On appeal regarding the first order, the siblings Audi, Majid, and May contend that the probate court erred in determining that Ed's revocation of the trust was invalid.

---

[1] For clarity and convenience, we will refer to members of the Daou or Hamady family by their first names after initially using their full names.

The siblings argue, among other reasons, that the trust instrument does not explicitly make the method of revocation provided in the trust instrument the exclusive method of revocation, that the trust could therefore be revoked by the method provided in Probate Code section 15401, subdivision (a)(2),[2] and that Ed complied with the statutory method. Regarding the second order, the siblings contend that the court abused its discretion in denying their request for a continuance of an evidentiary hearing.

As an intermediate court of appeal, our task is limited to interpreting and applying the law. (*Keh v. Walters* (1997) 55 Cal.App.4th 1522, 1533.) Based on section 15401, subdivision (a)(2) and *Masry v. Masry* (2008) 166 Cal.App.4th 738 (*Masry*), we determine that the trust instrument did not provide the exclusive method by which the trust could be revoked, and that Ed complied with the statutory method of revocation. We also determine that no abuse of discretion has been shown in the denial of the requested continuance. Therefore, we will reverse the order determining that the revocation of the trust was invalid, and we will affirm the order determining that the property ownership agreement is void.

In case No. H039461, the probate court determined that certain property belonged to the trust. On appeal, the siblings Audi, Majid, and May contend, among reasons, that the order has no effect if the trust was validly revoked. As we will explain, we will reverse the order in view of our determination that the trust was validly revoked.

## II.  FACTUAL AND PROCEDURAL BACKGROUND

### A.  *The Trust and the Property Ownership Agreement*

Carmen and Ed, an architect, married in 1981.  A son and daughter were born during the marriage.

---

[2] All further statutory references are to the Probate Code unless otherwise indicated.

3

Carmen testified that she and Ed did not have any assets when they married. In the mid-1980's, Ed started two businesses, a construction company called Civitaf and another entity called Civitaf Three Development Company. Ed obtained the capital to start the business by working. The businesses were very successful and were still in existence at the time of the evidentiary hearing in 2012.

Carmen testified that in 2006, she and Ed met with an attorney, Stuart Schmidt, for estate planning purposes. At the first meeting, they told the attorney that they wanted to put everything in a trust, and that everything would go to the surviving spouse and then to the children.

Prior to or during the second meeting with the attorney, Ed told Carmen that she had to sign a document concerning Civitaf. Carmen objected to the agreement and did not sign it initially. At a third meeting with the attorney, after the attorney stepped out of the room, Ed again told Carmen that he wanted her to sign the agreement. Carmen continued to object, but she eventually agreed to sign it out of fear that Ed would beat her on the way home and at home. Ed was getting very mad, and had a "look" on his face that Carmen "always remembered that he would beat the crap out of [her]." Ed had beaten her on many prior occasions during the marriage.

Attorney Schmidt testified that Carmen and Ed argued about the property ownership agreement when it was first presented for signing. It was Schmidt's understanding that Carmen objected to signing the agreement because the Civitaf entities were listed as separate property and she believed they were community property. Schmidt took a break and left Carmen and Ed alone. When Schmidt next saw the couple, they said that they had worked it out. Schmidt witnessed Carmen signing the agreement. Schmidt believed that Carmen "felt pressure and signed it most likely because of her husband." Schmidt perceived Ed as the type of person who "was in charge" and as an "asshole."

4

As a result of the meetings with attorney Schmidt, Carmen and Ed executed the Daou Hamady Revocable Trust on November 17, 2006. In the trust instrument, Carmen and Ed are identified as the settlors and the trustees. The trust estate included articles of personal and household use, cash, stock, real property, and "[a]ll interest and shares in Civitaf Corporation and Civitaf Three Development, Co." The trust instrument states that community property transferred to the trust will remain community property, and separate property transferred to the trust will remain separate property unless a written document provides otherwise. The trust instrument contains provisions regarding division of the trust estate and distributions after the death of the first spouse, and payments and distributions on the death of the surviving spouse.

Regarding revocation, the trust instrument states in part: "Section 8 POWER TO REVOKE OR AMEND TRUST [¶] 8.1 Revocation During Settlors' Joint Lifetime. During the joint lifetime of Settlors, this Trust may be revoked, in whole or in part, with respect to the community property of Settlors by an instrument in writing signed by either Settlor and delivered by certified mail to all current acting Trustees and the other Settlor, and with respect to separate property by an instrument in writing signed by the Settlor who contributed that property to the Trust, delivered by certified mail to the Trustees."

The property ownership agreement, which Carmen and Ed also signed on November 17, 2006, provides that the property listed in a "Schedule A," specifically Civitaf Corporation and Civitaf Three Development, Co., are the separate property of Ed. The agreement further provides that "all" of the couple's other property, as of the date the agreement is signed, is community property.

Jack Allen, a certified public accountant who prepared tax returns for Ed and Carmen, testified that Ed could be very demanding and controlling. Allen was intimidated by Ed, and Allen eventually lied to Ed about going into semiretirement so he could stop working for Ed. Allen felt "it was emotionally draining as [Ed's] CPA for all these years . . . ."

5

Ed and Carmen's daughter, respondent Christina Daou,[3] who was 21 years old at the time of the evidentiary hearing, saw Ed hit Carmen on many occasions. Ed was also verbally abusive. Christina testified that "there was no such thing as not doing what he says. There is no such thing. Doesn't exist." She also testified that "technically people have free will, but not in our household."

On July 20, 2011, Ed executed a "Revocation of Trust" with respect to the Daou Hamady Revocable Trust. In the revocation, Ed stated that he revoked the trust as to "our community property and as to my separate property." The next day, on July 21, 2011, Carmen's family law attorney "received notice of the Revocation" by certified mail.

On July 27, 2011, Ed killed his and Carmen's son, and then killed himself. Carmen did not receive the "Revocation of Trust" until after Ed's death.

B. *The Petition and Counter Petition Regarding the Trust and the Property Ownership Agreement (Case No. H038994)*

In September 2011, Carmen as trustee provided Ed's siblings Audi, May, and Majid with written notification that, pursuant to section 16061.7, they had a specified period of time to bring an action to contest the trust.

On January 10, 2012, Audi, who was represented by counsel, filed a petition contesting the validity of the trust. Audi alleged that Ed had revoked the trust after Carmen filed for divorce, that Ed's property in the trust reverted back to Ed, and that Ed's property should be distributed pursuant to his will dated July 26, 2011. Audi alleged that she was the nominated executor of Ed's estate, and that she was among the siblings who were beneficiaries under his will. Audi further alleged that Ed and Carmen had executed a property ownership agreement in which Carmen acknowledged that all shares of Civitaf

---

[3] Carmen and Ed's daughter is variously identified as "Christine" and "Christina" in the record. Because she testified that her name is spelled "Christina," we will use that name in this opinion.

6

Corporation and Civitaf Three Development Company, Co. remained Ed's separate property. Audi sought an order pursuant to section 850 concerning the title of the property. The petition indicated that a hearing on the matter was scheduled for March 1, 2012.

Audi was no longer represented by January 23, 2012, when the probate court granted her attorneys' application to withdraw as attorneys of record.

On February 23, 2012, Carmen and her daughter, Christina, filed a single document containing a response to Audi's petition and a "counter petition"[4] against Audi and respondent John I. Kessler[5] as the representative and administrator of Ed's estate. In the response, Carmen and Christina alleged that Ed's revocation did not comply with the method outlined in the trust or the statute, and that therefore the revocation was not valid. In the counter petition, relevant to this appeal, Carmen and Christina sought declaratory relief regarding the property ownership agreement. They alleged that the property ownership agreement was void and that Civitaf Corporation and Civitaf Three Development Co. were community property, rather than separate property. The response and counter petition was served by mail on Audi at multiple addresses, including two addresses "c/o," or "in care of" May and "in care of" Majid.

On February 27, 2012, Kessler served a response to Audi's petition and to Carmen and Christina's counter petition. Kessler alleged that, pursuant to a stipulation between the parties, the court appointed him as special co-trustee of the trust in September 2011. Kessler indicated that he did not intend to litigate Audi's petition which pertained to the validity of the trust. Further, as the court-appointed special administrator of Ed's estate,

---

[4] The record on appeal is missing page 6 of Carmen and Christina's response and counter petition. On our own motion, we augment the record on appeal in case No. H038994 to include this page. (Cal. Rules of Court, rule 8.155(a)(1)(A).)

[5] Kessler has not filed a respondent's brief in case No. H038994.

7

Kessler generally indicated that he did not have a "stake" in the counter petition. Kessler's response was served by mail on Audi, May, and Majid, among others.

At the March 1, 2012 hearing on Audi's petition, attorney Joseph Kerendian "specially appear[ed]" for Audi. Although the hearing date was listed on the first page of Audi's petition, Kerendian claimed that neither he nor Audi knew about the hearing. Kerendian stated that Audi was out of the country and that she had retained his services "to help her retain counsel" for the case. Kerendian requested a continuance so that Audi could retain counsel. The court granted the continuance to April 12, 2012.

On April 12, 2012, the matter was continued to May 24, 2012. On April 19, 2012, Carmen served Audi by mail with notice of the hearing set for May 24, 2012 on Carmen's counter petition. Audi was served by mail at multiple addresses, including two addresses "c/o," or "in care of" May and "in care of" Majid.

On May 17, 2012, each of the siblings Audi, May, and Majid were served with Carmen and Chirstine's written status conference statement concerning the petition and counter petition.

At the May 24, 2012 hearing, attorney Kerendian again "specially appear[ed]" for Audi. Kerendian indicated that he had been "hired" by Audi "to assist her in finding counsel." The probate court observed that the matter had been continued from March 1 and April 12 and that the same representation had previously been made. The court asked Kerendian, "when realistically do you think she will actually be represented?" Kerendian stated that he had been "continuously trying to find counsel," that he believed he had found an attorney but the attorney informed him that they were not able to accept the case two or three weeks ago, and that he had "a couple of friends . . . lined up" who might agree to accept the case. Carmen's attorney contended that they had been waiting since January for Audi to obtain an attorney and objected to any further continuance. The court ordered that Audi had until June 22, 2012 to file objections or a response to

Carmen's counter petition, whether or not Audi had an attorney by that point. The court scheduled another hearing for July 12, 2012.

In June 2012, Audi as a self-represented litigant submitted written opposition to Carmen and Christina's counter-petition. On the written opposition, Audi provided a San Clemente, California address, which was the same address that the parties had been using to serve May.

At the July 12, 2012 hearing, counsel for Carmen and counsel for Christina appeared, and Audi did not appear. Carmen's counsel wanted the matter set for hearing. The probate court responded, "That's obviously my concern in all of this is we need to get resolved the issue of the will, the trust, the evidentiary hearing context." The matter was set for an evidentiary hearing on September 27, 2012. When the probate court indicated that the "other side" needed to be informed of the hearing and the briefing date, counsel for Carmen stated: "We will do that, Your Honor."

The next day, on July 13, 2012, Carmen's counsel mailed a letter to Audi at the San Clemente address notifying her about the upcoming hearing. In particular, the letter stated, "Please also be advised that the Court set for **September 27, 2012**, in Department 3, a one-day trial of the following matters: [¶] 1. Audi Daou's Petition Contesting Validity of Trust Due to Revocation of Trust; [¶] 2. Carmen Hamady's Probate Code § 850 Petition."

A hearing was held on August 31, 2012. Attorney Kerendian again "specially appear[ed]" for Audi. Also specially appearing for Audi was attorney Stan Mallison, who would ultimately appear in the case as counsel for Audi and her siblings. During the hearing, Carmen's attorney indicated that he did not "want the trial continued." Attorney Mallison later indicated that he was in negotiations with Audi and that he anticipated substituting into the case to represent her.

On September 20, 2012, Audi filed a substitution of attorney form indicating that she had obtained counsel, including Mallison and Amber Rodriguez, to represent her and

9

that she was no longer representing herself. That same day, Majid and May apparently made their first appearances in the action by filing forms indicating that they were being represented by the same set of attorneys as Audi.[6]

### C. *The Siblings' Request for a Continuance*

On or about September 24 or 25, 2012, the siblings Audi, Majid, and May submitted a written request for a continuance of the evidentiary hearing. Carmen and Christina submitted a written response to the continuance request. At a hearing on September 25, 2012, the probate court denied the request for a continuance.

### D. *The Evidentiary Hearing Regarding Revocation of the Trust and the Property Ownership Agreement*

The evidentiary hearing began on September 27, 2012. The probate court first considered the issue of whether the trust had been revoked by Ed. The court received evidence from the parties primarily by way of stipulation and heard argument from counsel. Among other arguments, counsel for the siblings contended that a temporary restraining order had previously been issued prohibiting Ed from contacting Carmen directly, and that Ed's service of the written revocation of the trust on Carmen's family

---

[6] At oral argument, the parties addressed the issue of Majid's and May's appearance in the probate court. This court at oral argument requested supplemental briefing from Majid and May regarding how they appeared and joined in the action below. Based upon the supplemental briefing and our careful review of the record on appeal, it appears that Majid and May did not formally join in Audi's petition or file a petition of their own. However, the record on appeal reflects that, after Majid and May filed the forms indicating that they were being represented in the action by the same set of attorneys as Audi, Majid's and May's names appeared on all documents subsequently filed by Audi and hence it appears that they joined in all the arguments made by Audi. We further observe that, at the September 27, 2012 evidentiary hearing, when the probate court indicated its assumption that Majid and May had joined in Audi's petition, counsel for the siblings responded that Majid and May's "only status is as a [section] 1043 appearance. They are an interested person who is appearing to respond or object in writing before the hearing." (See § 1043, subds. (a) & (b) [an interested person may appear and make an oral or written response or objection at or before the hearing].)

10

law attorney was therefore proper. After hearing argument from counsel, the court determined that Ed's revocation was "invalid." The court believed that the trust instrument provided the "exclusive methodology by which it is to be revoked." The court stated that Ed's "failure to provide Carmen with notice of that revocation by certified mail, either to her current or last known address, was a failure to comply with [the] notice requirement" set forth in the trust instrument.

After the probate court ruled on the revocation issue on September 27, 2012, the court received additional evidence that same day and on October 4, 2012, regarding the issue of the property ownership agreement. After hearing argument from counsel, the court determined that the property ownership agreement "is of no force and effect." The court referred to testimony regarding Ed's conduct and treatment of Carmen, family members, and people who worked for him. The court found that the agreement was "signed by Carmen under undue influence and it was done for Ed to obtain an unfair advantage."

On November 7, 2012, the siblings filed a notice of appeal with respect to the probate court's orders of September 27, 2012, regarding the invalid revocation of the trust, and October 4, 2012, regarding the unenforceability of the property ownership agreement (case No. H038994).

On December 5, 2012, the probate court filed an order regarding Audi's petition contesting the validity of the trust due to revocation. The order states: "The Daou Hamady Revocable Trust contains a power to revoke as set forth in Section 8 entitled Power to Revoke or Amend Trust. The Court interprets Section 8 as being the exclusive methodology by which to revoke the Trust during the lifetime of the Settlors. The Trust document is a self-contained document that provides all of the aspects and the relationship of the parties, and sets forth how they are to conduct themselves. The Trust is a separate and independent document. The Settlors specifically spelled out the method of revocation in the Trust. [¶] It is hereby determined that: [¶] 1. The Trust contains

11

the exclusive methodology by which it is to be revoked; [¶] 2. Sending notice to Carmen Hamady's family law attorney . . . via certified mail, does not constitute proper notice to Ms. Hamady under the terms of the Trust; [¶] 3. The failure to provide Carmen Hamady with notice of the revocation by certified mail, either to her current or last known address, was a failure to comply with the notice requirements. Consequently the revocation is invalid."

On December 6, 2012, the probate court filed an order regarding Carmen's claim for declaratory relief in her counter petition. In the order, the court explained that the property listed in Schedule A of the property ownership agreement is presumed to be community property because it was acquired or formed during the marriage, and no evidence was presented to rebut that presumption. Further, the agreement "is presumed to be a product of undue influence because its results would be unfair under the facts of this case." The court found that "[n]o evidence was presented to rebut that presumption, and the weight of the evidence was to the contrary." The court referred to evidence relating to the "physical and emotional abuse suffered by Carmen Hamady at the hand of her husband, Ed Daou." Further, after Carmen had objected to signing the agreement, "Ed exercised control over Carmen through non-verbal, threatening conduct" and Carmen "feared a beating if she did not sign the [agreement]." In addition, the couple's daughter testified about the lack of free will at their house, and the accountant testified about being intimidated by Ed. The court concluded that the agreement "was signed by Carmen under undue influence and was done for Ed to obtain unfair advantage over Carmen. No evidence was presented to overcome the presumption of undue influence. Consequently, the [agreement] is of no force and effect and is void, and Civitaf

Corporation and Civitaf Three Development Co. are therefore deemed community property."[7]

### E. *The Petition to Determine the Trust's Title to Certain Property (Case No. H039461)*

In or about December 28, 2012, Carmen submitted a petition to the probate court under section 850 seeking an order confirming and/or determining the trust's title to certain property. The siblings Audi, Majid, and May opposed the petition.

On January 30, 2013, a hearing was held on the petition. After hearing argument from counsel, the probate court granted the petition. By written order filed that same day, the court "confirmed" as belonging to the trust two vehicles and certain interests in five companies, and authorized the execution of any documentation necessary to transfer the property to the trust.

On March 25, 2013, the siblings filed a notice of appeal from the order (case No. H039461).[8]

On July 12, 2013, this court ordered the appeals in case No. H038994 (regarding revocation of the trust) and case No. H039461 (regarding the trust's title to certain property) considered together for the purposes of record preparation, briefing, oral argument, and disposition.

### III. DISCUSSION

#### A. *Revocation of the Trust (Case No. H038994)*

##### 1. Premature notice of appeal

On September 27 and October 4, 2012, the probate court orally stated its determinations that Ed's purported revocation of the trust was invalid and that the

---

[7] The December 5 and 6, 2012 orders are appealable. (§§ 1300, subd. (k), 1304, subd. (a).)
[8] The order is appealable. (§ 1300, subd. (k).)

13

property ownership agreement signed by Ed and Carmen had no force or effect. Subsequently, on November 7, 2012, the siblings filed a notice of appeal regarding the probate court's determinations. Thereafter, on December 5 and 6, 2012, the court filed written orders concerning the invalid trust revocation and the void property ownership agreement. To the extent the siblings' notice of appeal was filed prematurely, we treat the notice of appeal as filed immediately after entry of the orders on December 5 and 6, 2012. (See Cal. Rules of Court, rule 8.104(c), (d) & (e).)

## 2. Revocation

Regarding revocation, the trust instrument states: "During the joint lifetime of Settlors, this Trust may be revoked, in whole or in part, with respect to the community property of Settlors by an instrument in writing signed by either Settlor and delivered by certified mail to all current acting Trustees and the other Settlor, and with respect to separate property by an instrument in writing signed by the Settlor who contributed that property to the Trust, delivered by certified mail to the Trustees."

The siblings Audi, Majid, and May contend that, although the trust instrument sets forth a method for revoking the trust, there is no explicit statement in the trust instrument that this is the exclusive method by which the trust may be revoked. The siblings contend that the trust may therefore be revoked pursuant to the method set forth in section 15401, subdivision (a)(2), and that Ed complied with this statutory method of revocation. The siblings also contend that, even if the trust instrument sets forth the exclusive method of revocation, Ed substantially complied with that method.

Carmen and Christina contend that the method of revocation set forth in the trust instrument is the exclusive method by which the trust may be revoked, that Ed failed to comply with the trust instrument, and that even if Ed may proceed by way of the statutory method of revocation he failed to comply with that method.

14

## a. *Standard of review*

Our resolution of the issue of whether Ed validly revoked the trust begins with an analysis of section 15401 and the language of the trust instrument. Statutory interpretation involves a purely legal question to which we apply the independent standard of review. (*Burden v. Snowden* (1992) 2 Cal.4th 556, 562.) The interpretation of a trust instrument also presents a question of law subject to independent review when, as here, there relevant evidence is undisputed. (*Burch v. George* (1994) 7 Cal.4th 246, 254.)

## b. *Ed may revoke by the statutory method of revocation*

In construing section 15401, "we begin with its plain language, affording the words their ordinary and usual meaning. [Citation.] The words the Legislature chose to enact are the most reliable indicator of its intent. [Citation.]" (*King v. Lynch* (2012) 204 Cal.App.4th 1186, 1193.) Relevant here, section 15401, former subdivision (a)[9] states:

"A trust that is revocable by the settlor may be revoked in whole or in part by any of the following methods:

"(1) By compliance with any method of revocation provided in the trust instrument.

"(2) By a writing (other than a will) signed by the settlor and delivered to the trustee during the lifetime of the settlor. *If the trust instrument explicitly makes the method of revocation provided in the trust instrument the exclusive method of revocation, the trust may not be revoked pursuant to this paragraph.*" (Italics added.)

---

[9] Section 15401, former subdivision (a) (Stats. 1994, ch. 806, § 37) is hereafter referred to as section 15401(a). Section 15401 was amended effective January 1, 2013, after the probate court ruled on the revocation issue. The 2013 amendment is not relevant to this opinion.

In determining whether the trust instrument in this case "*explicitly* makes the method of revocation provided in the trust instrument the exclusive method of revocation" (§ 15401, subd. (a)(2), italics added), we first consider the meaning of "explicit." In *Huscher v. Wells Fargo Bank* (2004) 121 Cal.App.4th 956 (*Huscher*), the appellate court considered that term in the context of a trust modification. The *Huscher* court explained that "explicit" "is equated with the term 'express,' and means directly and distinctly stated in plain language that is unequivocal and unambiguous. [Citation.] Webster's [dictionary] defines 'explicit' as 'fully revealed or expressed without vagueness, implication, or ambiguity: leaving no question as to meaning or intent.' Webster's also states that 'explicit' is synonymous with 'express' and 'definite.' According to Webster's, explicit 'implies such verbal plainness and distinctness that there is no need for inference and no room for difficulty in understanding.' The word 'definite' 'stresses precise, clear statement or arrangement that leaves no doubt or indecision,' while 'express' 'implies both explicitness and direct and positive utterance.' [Citation.] The most obvious way to do something expressly is to precisely state that you are doing so. [Citation.] *In other words, a modification method is explicitly exclusive when the trust instrument directly and unambiguously states that the procedure is the exclusive one*. 'Explicit' is usually contrasted with 'implicit.' [Citation.] When something is implied or implicit, it is 'capable of being understood from something else though unexpressed.' [Citation.]" (*Id.* at p. 968, italics added & fn. omitted.) In a footnote, the *Huscher* court explained, "For example, the trust could state that the modification method is exclusive or that the trust can be modified only by following the prescribed procedure." (*Id.* at p. 968, fn. 9.)

In *Masry*, an appellate court addressed whether the revocation method set forth in a trust instrument was explicitly exclusive under section 15401(a)(2). In *Masry*, a husband and wife created a family trust consisting of community property. Each spouse was a trustor and trustee. The revocation provision in the trust instrument provided:

16

" 'Each of the Trustors hereby reserves the right and power to revoke this Trust, in whole or in part, from time to time during their joint lifetimes, by written direction delivered to the other Trustor and to the Trustee.' " (*Masry*, *supra*, 166 Cal.App.4th at p. 740.)

In concluding that the trust instrument did *not* explicitly provide the exclusive method of revocation, the *Masry* court looked to dictum in *Huscher*, which the *Masry* court found "so persuasive that it becomes the law here." (*Masry*, *supra*, 166 Cal.App.4th at p. 741.) As explained by the *Masry* court, "[t]he issue in *Huscher* involved amendments to a trust under Civil Code former section 2280, the predecessor to Probate Code section 15401 enacted in 1986, but its reasoning applies to revocation. The right to revoke includes the right to modify. [Citations.] [¶] *Huscher* chronicled and analyzed the history of Civil Code former section 2280. Just before it was replaced by Probate Code section 15401, Civil Code section 2280 provided that every voluntary trust is revocable ' "[u]nless expressly made irrevocable by the instrument creating the trust . . . ." ' [Citation.] The *Huscher* court concluded that language in trust documents that purports to revoke under Civil Code section 2280 is reasonably subject to an analysis of whether the language *explicitly or implicitly* makes the method of revocation exclusive." (*Masry*, at p. 741, italics added.)

The *Masry* court believed that, under the analysis in *Huscher* concerning former Civil Code section 2280, an argument could be made that the language in the Masry trust, which provided that a trustor had to give notice of revocation to the other trustor and to the trustee, "is implicitly exclusive." (*Masry*, *supra*, 166 Cal.App.4th at p. 741.) However, the *Masry* court found "this argument . . . less persuasive under . . . Probate Code section 15401, subdivision (a)(2). *Huscher* points out that 'a modification method is explicitly exclusive when the trust instrument directly and unambiguously states that the procedure is the exclusive one.' [Citation.] . . . [S]ection 2.1 of the [Masry] Trust does not state that the method of revocation it provides is explicitly exclusive. It is simply one method of revocation in addition to that provided in Probate Code

17

section 15401, subdivision (a)(2). . . . If the language in the trust were sufficient to qualify as the explicitly exclusive method, then the language in section 15401, subdivision (a)(2) would be unnecessary." (*Masry*, *supra*, at p. 742; see Rest.3d Trusts, § 63, com. i [revocation procedure is exclusive if it provides that trust may be revoked " 'only' " by a notice in writing delivered to the trustee]; *Estate of Giraldin* (2012) 55 Cal.4th 1058, 1072 ["California courts have considered the Restatement of Trusts in interpreting California trust law"]; see also *Ritchey v. McCreath (In re Estate of McCreath)* (Colo.Ct.App. 2009) 240 P.3d 413, 416, 421 [analyzing the Restatement Third of Trusts and determining that a trust which states that revocation "shall" take effect upon the following of specified procedures provided "the explicit protocol for revocation"]; *Patterson v. Patterson* (Utah 2011) 266 P.3d 828, 838 [holding that trust provision stating that trust " 'may' " be amended or revoked by written instrument delivered to trustee was not a method " 'expressly made exclusive' " pursuant to Utah statute because it did "not expressly state that this is the *only* permissible method"].)

We agree with *Masry* that, in order to give the second sentence of section 15401(a)(2) meaning, it must be interpreted to require a trust instrument to *explicitly* provide that the revocation method set forth in the instrument is the exclusive method. We further agree with *Masry* that *implicit* exclusivity, such as when only one method of revocation is set forth in the trust instrument, is not sufficient to foreclose the use of the statutory method of revocation. (*Masry*, *supra*, 166 Cal.App.4th at pp. 741-742; but see *Conservatorship of Irvine* (1995) 40 Cal.App.4th 1334, 1344, fn. 3 [stating in dictum that "section 15401 makes it clear a trustor may provide express provisions in the trust agreement for revocation of the trust, and that method then will be the exclusive method for revocation of the trust"]; *Gardenhire v. Superior Court* (2005) 127 Cal.App.4th 882, 886, 894 [holding that a trust provision providing for revocation by "written notice" permitted revocation by will, and stating in dictum that if "the trust is not silent and instead provides a method of revocation," then the statutory method of

18

revocation under "section 15401, subdivision (a)(2) is inapplicable"].)  We therefore agree with *Masry*'s conclusion that, "absent language in the trust that its method of revocation is exclusive, the trustor has the option of revoking according to the method provided in Probate Code section 15401, subdivision (a)(2) . . . ."  (*Masry*, *supra*, at p. 743.)

In this case, we determine that although the trust instrument provides for *a* method of revocation depending on the type of property at issue (that is, one revocation method for community property and one revocation method for separate property), the trust instrument does not *explicitly* make these the exclusive method.  The trust instrument provides:  "During the joint lifetime of Settlors, this Trust may be revoked, in whole or in part, with respect to the community property of Settlors by an instrument in writing signed by either Settlor and delivered by certified mail to all current acting Trustees and the other Settlor, and with respect to separate property by an instrument in writing signed by the Settlor who contributed that property to the Trust, delivered by certified mail to the Trustees."  The trust instrument does not " 'directly and unambiguously state[] that the procedure is the exclusive one.' "  (*Masry*, *supra*, 166 Cal.App.4th at p. 742.)  For example, the trust instrument does not state that the trust may be revoked only by following the prescribed procedure.  Rather, similar to the revocation provision in *Masry*, the revocation provision at issue in this case "is simply one method of revocation in addition to that provided in Probate Code section 15401, subdivision (a)(2)."  (*Masry*, *supra*, at p. 742.)

Carmen and Christina argue that, because of the particular revocation method set forth in the trust instrument and because of the level of specificity reflected in the method, that revocation method in the trust instrument should be determined the exclusive method.  We are not persuaded by these arguments.  None of the language identified by Carmen and Christina in the trust instrument *explicitly* makes the stated revocation method the *exclusive* method of revocation.  (§ 15401(a)(2).)

19

Carmen and Christina further argue that Family Code section 761, subdivision (b) precluded Ed from "unilaterally and secretly" revoking the trust as to community property in view of the provision in the trust instrument requiring notice of revocation.

We determine that the Family Code provision did not preclude Ed's revocation here. Family Code section 761, subdivision (b) states: "Unless the trust instrument expressly provides otherwise, a power to revoke as to community property may be exercised by either spouse acting alone." (Fam. Code, § 761, subd. (b); see § 15401, subd. (b) [generally providing that, if a trust is created by multiple settlors, each settlor may revoke as to the portion of the trust contributed by that settlor, "except as provided in Section 761 of the Family Code"].) In this case, the trust instrument provides that a "Settlor" (Ed or Carmen) may revoke the trust as to community property in a signed writing delivered to all trustees and "the other Settlor." Requiring delivery of the written revocation, however, is not the same as eliminating the power to act alone in revoking the trust. There is no language in the revocation provision "expressly provid[ing]" that a settlor/spouse does *not* have the power to act alone in revoking. (Fam. Code, § 761, subd. (b).) For example, the revocation provision does not require one spouse to obtain the consent of the other spouse, nor require joint action by the spouses in order to revoke as to community property. We therefore determine, based on the language of the revocation provision and Family Code section 761, subdivision (b), that one spouse is not precluded from unilaterally revoking the trust as to community property. (*Masry*, *supra*, 166 Cal.App.4th at p. 743 [concluding that, where trust required the trustor/spouse to deliver the revocation to the other trustor/spouse, a unilateral and secret revocation by one spouse did not violate Family Code section 761, subdivision (b)].)

In sum, we determine that the trust instrument does not "explicitly make[] the method of revocation provided in the trust instrument the exclusive method of revocation." (§ 15401(a)(2).) The trust may therefore be revoked by the statutory method set forth in section 15401(a)(2).

20

### c. *Ed complied with the statutory method of revocation*

As we have stated, section 15401(a)(2) provides that a trust may be revoked "[b]y a writing . . . signed by the settlor . . . and delivered to the trustee during the lifetime of the settlor." In determining whether Ed's revocation complied with this section, we find *Masry* instructive.

In *Masry*, similar to the instant case, a husband and wife created a trust and each was a trustor and trustee. (*Masry*, *supra*, 166 Cal.App.4th at p. 740.) Further, as in the instant case, the husband in *Masry* executed a revocation notice and died before his wife was given notice of the revocation. (*Id.* at pp. 740-741.) The *Masry* court determined that the "trustor" could revoke "according to the method provided in Probate Code section 15401, subdivision (a)(2), delivering notice to himself as trustee." (*Id.* at p. 743.) That there were two trustees, husband and wife, did "not change [the *Masry* court's] view." (*Ibid.*) The *Masry* court concluded that, "[u]nder section 15401 subdivision (a)(2), [the husband's] notice to himself is sufficient as notice to 'the trustee.' " (*Masry*, *supra*, at p. 743.)

In this case Ed, who was a settlor and trustee along with Carmen, signed a written revocation concerning the trust on July 20, 2011, before he died. As in *Masry*, Ed's "notice to himself is sufficient as notice to 'the trustee' " under section 15401(a)(2), even though Carmen was also a trustee. (*Masry*, *supra*, 166 Cal.App.4th at p. 743.)

Carmen and Christina argue that section 15401(a)(2) should be construed in a manner to require the person who signs the revocation to give notice to the other trustee. According to them, the "delivered" requirement in section 15401(a)(2) is otherwise rendered "meaningless."

We are not persuaded by this argument. When a trust is created by only one settlor, and that settlor is also the sole trustee, the person would be entitled to revoke the trust by simply executing a written revocation, without having to deliver the written revocation to someone else. We discern no basis for interpreting section 15401(a)(2)

differently when there are two settlors who are also trustees, as in this case, by requiring one settlor/trustee to notify the other settlor/trustee of a revocation.

In sum, we determine that the trust did not explicitly make the method of revocation in the trust instrument the exclusive method, that Ed complied with the revocation method set forth in section 15401(a)(2), and that his revocation of the trust was therefore valid. Accordingly, we reverse the December 5, 2012 order on Audi's petition in which the probate court determined that the revocation was invalid.[10]

In view of our determination that Ed validly revoked the trust pursuant to the revocation method set forth in section 15401(a)(2), we need not reach the issue of whether he complied with the method of revocation set forth in the trust instrument, and we accordingly express no view on that issue.

### 3. Request for continuance

Audi, May, and Majid contend that the probate court abused its discretion in denying their request for a continuance of the evidentiary hearing that resulted in the order determining the property ownership agreement between Ed and Carmen was void. Audi argues that after her original attorney withdrew, she was out of the country and had a difficult time finding a new attorney. When she and her siblings ultimately retained attorneys, the date of the evidentiary hearing was so close that their new attorneys needed additional time to conduct discovery and prepare for the hearing. The siblings further contend that none of them were present at the hearing when the evidentiary hearing date was set, and that Carmen's attorney sent a letter concerning the hearing date to Audi only. May and Majid contend that this did not constitute proper notice to them under section 851. May and Majid clarify that they "are not claiming that the lack of notice

---

[10] The siblings acknowledge that, even with revocation of the trust, Carmen is still "entitled to her share of the community estate," and that Ed is only entitled to his share of the community estate and to his separate property.

22

violated their constitutional due process rights." They "simply believe it was an abuse of discretion to deny a reasonable continuance under the circumstances." The siblings also assert that Carmen did not have any "legitimate" claim of prejudice if the hearing was continued.

Carmen and Christina contend that the probate court did not abuse its discretion in denying the request for a continuance. They argue, among other things, that the siblings were aware of Audi's petition and Carmen and Christina's counter petition for months, that the siblings failed to participate meaningfully in the proceedings during that time, and that the siblings fail to show prejudice. Carmen and Christina also contend that May and Majid were "estopped from contesting the trust as a matter of law" by February 13, 2012 pursuant to section 16061.8.

### a. *Background*

On or about September 24 or 25, 2012, the siblings Audi, Majid, and May submitted a written request for a continuance of the trial. They contended, among other things, that Carmen and Christina failed to comply with section 851 by failing to provide 30 days' notice of the evidentiary hearing set for September 27, 2012. The siblings also contended that their new attorneys needed additional time to prepare for the hearing, and they further requested that discovery be reopened. The siblings requested that the evidentiary hearing be set for no sooner than April 2013, or that it be continued for at least 90 days. In supporting declarations, the siblings stated that despite their "best efforts," they were not able to retain their current attorneys until "on or about September 16, 2012."

Carmen and Christina submitted a written response to the continuance request. They contended that section 851 did not apply and that, to the extent it did apply, its requirements had been complied with or waived. In a supporting declaration, counsel stated that he mailed a letter to Audi on July 13, 2012, notifying her about the September 27, 2012 trial date. Counsel attached a copy of the letter to his declaration.

23

A hearing was held on September 25, 2012. At the hearing, one of the siblings' attorneys, Rodriguez, indicated that she (Rodriguez) was initially contacted by Audi "around" August 31, 2012, the date on which Kerendian and Mallison specially appeared on behalf of Audi at a hearing. The probate court asked Rodriguez whether Audi at that time informed Rodriguez about the September 27 hearing. Rodriguez stated that Audi told her there were several hearings calendared but that Audi "didn't have a really clear understanding that it was actually a trial this time." The court asked Rodriguez whether attorney Kerendian "let [Rodriguez] know that on September 27th you've got the equivalent of a trial." Rodriguez replied, "I believe he may have been the person that made me aware that we needed to take a closer look immediately at the upcoming hearing dates." Rodriguez further acknowledged that she agreed to represent the parties "knowing that [she] may have to be in trial on the 27th."

The probate court explained that it "always tell[s] attorneys that, . . . sure you can make a request for a continuance because of new counsel . . . but you have to assume the worst. So if I'm going to accept this, I'm going to accept it knowing that I may have to go to trial; and, obviously, I'm going to be at a disadvantage because we've got people that have been doing discovery and are prepared and everything else and I don't have that advantage."

The court eventually asked the sibling's counsel why the matter should be continued. The siblings' counsel stated that there was a "notice issue . . . in regards to the counterpetition filed by Carmen and Christina."

The probate court believed, however, that Audi had "been involved in this all the way along. She filed a petition in the matter. She was represented by counsel. Counsel withdrew because for among other things, there was a problem with communications with [her]. She had Mr. Kerendian make numerous special appearances on her behalf. She ultimately filed, in pro per, a response on June 22nd." The court indicated that it was "trying to understand" the notice issue.

24

The siblings' counsel indicated that there was a notice issue with respect to May and Majid as well. The probate court believed, however, that May and Majid had "been receiving notices" but had "not bothered" to say anything "during this entire proceeding. Now, all of a sudden, they are claiming to want to be involved, literally, on the eve of trial." The siblings' counsel contended that, at a "critical point in time" May and Majid "were not receiving notice directly."

The probate court recounted the continuances on March 1, April 12, and May 24, and the special appearances by attorney Kerendian through August 31, which reflected "involvement" and "aware[ness] of what's going on." Counsel for the siblings stated that "[n]otice is just not an awareness of what's going on," and that they were concerned about the "statutory requirements of what type of notice has to be given." Counsel further indicated that the siblings did not have a "complete understanding of what was going on."

The probate court later stated: "[I]n terms of the timing, if truly there was going to be a problem, I would think something would have been done right after the August 31st hearing, but here we are literally with these ex parte requests that are showing up this week. . . . [W]e've got people over here that, I'm assuming, are preparing for hearing and have been, since I set it in July, and for which, [Audi] was aware."

The siblings' counsel argued that, "She may have been aware but there was no notice given of the September 27th hearing date."

Carmen's counsel argued that they had experienced continued delays as a result of Audi not having an attorney, that the probate court had "bent over backwards," and that "a tremendous amount of time and money" had been spent in reliance on the trial date. Carmen's counsel contended that it would "greatly prejudice" Carmen if the trial was "now put off and we were to have to start this thing all over again."

After hearing further argument, the probate court stated: "Certainly, I don't believe Audi Daou has any claim of a lack of notice in this particular matter. She

25

initiated the process. She filed, in her own name, a response to the proceeding . . . shortly before it was set for evidentiary hearing. The other has been as I said before throughout this proceeding, provided with notice. They chose to do nothing. So for them to come forward, literally, on the eve of trial is ridiculous, and somehow claim they now want to play. We can't do that. [¶] So the request for the continuance is denied."

### b. *Standard of review*

The decision whether to grant or deny a request for a continuance is discretionary. (*Forthmann v. Boyer* (2002) 97 Cal.App.4th 977, 984.) An order denying a continuance is reviewed for abuse of discretion. (*Ibid.*) "The burden rests on the complaining party to demonstrate from the record that such an abuse has occurred. [Citation.]" (*Id.* at p. 985.)

### c. *No abuse of discretion has been shown*

We determine that the siblings fail to show that the probate court abused its discretion in denying the requested continuance.

First, Audi was given ample time to find a new attorney early in the proceedings. The record reflects that the probate court continued the hearing on Audi's petition several times beginning in March 2012. Ultimately, Audi had nearly five months to find a new attorney between the time her original attorney withdrew (January 23, 2012), and the deadline the probate court imposed for her to file a response to Carmen and Christina's counter petition (June 22, 2012) either with or without an attorney. Further, it was not until a subsequent hearing that the court set the evidentiary hearing for September 27, 2012. Audi therefore had three more months to prepare, by herself initially and later with the assistance of counsel, for the hearing with respect to her petition and Carmen and Christina's counter petition. Audi does not articulate a compelling basis for concluding that her presence outside the country warranted further delay in the proceedings.

Second, it appears that the continuance was not diligently sought by Audi or the siblings' prospective attorneys who were aware of the upcoming evidentiary hearing. Audi was notified by letter dated July 13, 2012 about the September 27, 2012 evidentiary

26

hearing. Although Audi and her siblings were in contact by at least August 31, 2012 with the attorneys who would ultimately represent them, and indeed attorney Mallison specially appeared for Audi at the August 31, 2012 hearing and stated that he was "negotiating with her right now" and "anticipate[d]" substituting into the case to represent her, and although the siblings stated that they were not able to retain the attorneys until "on or about September 16, 2012," the request for a continuance was not made until a few days before the September 27, 2012 hearing. As the probate court observed at the September 25, 2012 hearing on the continuance request, "in terms of the timing, if truly there was going to be a problem, I would think something would have been done right after the August 31st hearing, but here we are literally with these ex parte requests that are showing up this week." In contrast, the court indicated that others in the case had probably been preparing for the evidentiary hearing since it was set in July.

Third, the probate court reasonably determined that Audi did not have a valid basis for claiming a lack of notice in the proceeding, including with respect to the September 27, 2012 evidentiary hearing. She initiated the action with her petition, and she filed as a self-represented litigant a response to the counter petition. Further, attorney Kerendian specially appeared for Audi at the March 1 and May 24, 2012 hearings, and at the latter hearing he was informed of the date of the next hearing on July 12, 2012. Although there was no appearance by Audi at the July 12 hearing, Carmen's attorney sent a letter to Audi the next day, on July 13, 2012, notifying her that the "trial" on the petitions was scheduled for September 27, 2012. At least one of the siblings' prospective attorneys was thereafter "made . . . aware" by attorney Kerendian that they "needed to take a closer look immediately at the upcoming hearing dates." The siblings' attorney further acknowledged that she agreed to represent the parties "knowing that [she] may have to be in trial on [September] 27th." The record thus reflects that Audi was well aware, either personally or through an attorney representing her, of the ongoing proceedings including the September 27, 2012 evidentiary hearing.

27

Fourth, although Majid and May contend that they were not provided with proper notice of the evidentiary hearing under section 851,[11] there is no assertion that they lacked actual notice of either the petition or counter petition.  Indeed, in their reply brief on appeal, they acknowledge that they "received some notice of the initial petitions." They further state that they "are not claiming that the lack of notice violated their constitutional due process rights," and that they "simply believe it was an abuse of discretion to deny a reasonable continuance under the circumstances."  The probate court could reasonably conclude that May and Majid had not been diligent in seeking to appear and participate in the action despite knowledge that the action had been pending for many months.  In particular, May and Majid were given written notification in September 13, 2011 that, pursuant to section 16061.7, they had a specified period of time to bring an action to contest the trust; they were admittedly aware of the ongoing probate action; they were individually served with at least some of the documents in the action, while other documents for Audi were mailed to their addresses "c/o," or "in care of" May and "in care of" Majid; and they failed to articulate a persuasive reason for why they delayed

_____

[11] Section 851 states:  "(a) At least 30 days prior to the day of the hearing, the petitioner shall cause notice of the hearing and a copy of the petition to be served in the manner provided in Chapter 4 (commencing with Section 413.10) of Title 5 of Part 2 of the Code of Civil Procedure on all of the following persons where applicable:  [¶] (1) The personal representative, conservator, guardian, or trustee as appropriate.  [¶] (2) Each person claiming an interest in, or having title to or possession of, the property. [¶]  (b) Except for those persons given notice pursuant to subdivision (a), notice of the hearing, together with a copy of the petition, shall be given as provided in Section 1220 if the matter concerns a decedent estate, as provided in Section 1460 if the matter concerns a conservatorship or guardianship, or as provided in Section 17203 if the matter concerns a trust to all of the following persons:  [¶]  (1) Each person listed in Section 1220 along with any heir or devisee whose interest in the property may be affected by the petition if the matter concerns a decedent estate.  [¶]  (2) Each person listed in Section 1460 if the matter concerns a conservatorship or guardianship.  [¶] (3) Each person listed in Section 17203 if the matter concerns a trust.  [¶]  (c) The court may not shorten the time for giving the notice of hearing under this section."

28

appearing in the action, even as self-represented litigants, until September 20, 2012, which was one week before the evidentiary hearing. Under the circumstances, given the lack of diligence by May and Majid in seeking to appear and participate in the action which had been pending for approximately eight months, and given the prejudice a continuance would cause to the other parties who had been preparing for the hearing which was then only two days away, the court could reasonably conclude that a continuance was not warranted.

We therefore determine that the siblings fail to show that the probate court abused its discretion in denying the request for a continuance of the evidentiary hearing. Accordingly, we affirm the December 6, 2012 order on Carmen's claim for declaratory relief, in which the court determined that the property ownership agreement was void because of Ed's undue influence on Carmen when she signed it and that therefore Civitaf Corporation and Civitaf Three Development Co. are community property.

**B.** *The Trust's Title to Certain Property (Case No. H039461)*

As we have explained, the probate court (erroneously) determined that Ed's revocation of the trust was invalid. The court then granted a petition by Carmen on January 30, 2013, confirming that certain vehicles and certain interests in five companies belonged to the trust, and authorizing the execution of any documentation necessary to transfer the property to the trust.

On appeal, the siblings Audi, Majid, and May contend that, if this court determines that the trust was properly revoked by Ed, then the probate court's subsequent order concerning the trust's ownership of the vehicles and companies "will be nullified." If, however, this court determines that the revocation is invalid, the siblings raise several arguments challenging the order concerning the vehicles and companies belonging to the trust.

We have concluded that the trust was validly revoked. Because Carmen's petition and the probate court's order concerning the trust's title to certain property was premised

29

on the continued existence of the trust, the court's January 30, 2013 order must be reversed.

## IV. DISPOSITION

In case No. H038994, the December 5, 2012 order regarding Audi Daou's petition contesting the validity of the trust due to revocation is reversed. The December 6, 2012 order regarding Carmen Hamady's claim for declaratory relief, in which the court determined that the property ownership agreement was void and that therefore Civitaf Corporation and Civitaf Three Development Co. are community property, is affirmed. The matter is remanded for further proceedings consistent with the views expressed in this opinion.

In case No. H039461, the January 30, 2013 order confirming the trust's title to certain property is reversed. The matter is remanded to the probate court with directions to enter a new order denying Carmen Hamady's December 2012 petition for an order confirming and/or determining the trust's title to certain property.

The parties shall bear their own costs on appeal in both cases.

_____

BAMATTRE-MANOUKIAN, ACTING P.J.

WE CONCUR:

_____

MÁRQUEZ, J.

_____

GROVER, J.